# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

№ 06-CV-4922 (JFB) (ETB)
_____

PAUL J. CAPELLUPO,

Plaintiff,

VERSUS

NASSAU HEALTH CARE CORPORATION, DR. IRAM QAZI, IN HER OFFICIAL CAPACITY,
AND DR. JOSEPHINE DELAROSA, IN HER OFFICIAL CAPACITY,

Defendants.

_____

**MEMORANDUM AND ORDER**
June 16, 2009
_____

JOSEPH F. BIANCO, District Judge:

Plaintiff Paul J. Capellupo ("plaintiff") brings this Section 1983 action against defendants Nassau Health Care Corporation ("NHCC") and Drs. Iram Qazi and Josephine DeLarosa, in their official capacities, (collectively, "defendants"),[1] alleging that defendants, under color of state law, had him involuntarily committed as a psychiatric patient at Nassau University Medical Center ("NUMC")[2] for approximately two weeks, in violation of his rights under the First, Fourth and Fourteenth Amendments to the Constitution and the New York State Mental Hygiene Law. He further asserts claims of false imprisonment, unlawful arrest, and intentional infliction of emotional distress under New York State common law. Plaintiff seeks a declaratory judgment stating that defendants violated his rights, an order enjoining defendants from further engaging in such unlawful conduct, compensatory and punitive damages, attorney's fees and the costs of this action.

Defendants now move for summary judgment on all claims. For the reasons set

---

[1] Plaintiff originally named the County of Nassau, the Nassau County Police Department, Police Officer Thomas Riolo and Drs. Qazi and DeLarosa in their individual capacities as defendants in this action, but plaintiff has voluntarily withdrawn or dismissed his claims against these parties.

[2] NHCC is the corporate parent of NUMC.

forth below, defendants' motion is granted as to plaintiff's Section 1983 claim. The Court declines to exercise supplemental jurisdiction over any purported state claims and, thus, dismisses those claims without prejudice.

I. BACKGROUND

A. Facts

The Court has taken the facts described below from defendants' affidavits and exhibits filed in support of the instant motion and plaintiff's affirmation filed in opposition thereto.[3] Unless otherwise noted, the facts are undisputed. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of N.Y.*, 422 F.3d 47, 54-55 (2d Cir. 2005).

On September 13, 2005, plaintiff, a single male then residing alone at 87 Hardy Lane in Westbury, New York, called 911 emergency services to report that his home had been burglarized. Specifically, plaintiff reported to the responding officers from the Nassau County Police Department that the following items were missing: "A number of pornographic tapes out of a steamer trunk, which was in my closet, an adjustable miter box from my garage, and dog leashes that I noticed from my garage." (Plaintiff's Deposition at 625, Halpern Aff., Ex. N.) Plaintiff recounts that: "As we proceeded on in the conversation, I explained that there had been last week another entry in my home, and my underwear was stolen. Pots in the past had been stolen out of my pot cabinet." (*Id.*) When one of the officers specifically inquired about the stolen underwear, plaintiff recounted the conversation as follows: "[The police officer] said: 'Your [sic] telling me that someone stole your underwear?' I said, '[Y]es, second time this happened.' He said, '[W]ho would want to steal used underwear?'

---

[3] The Court notes that the document submitted by defendants entitled "56.1 Statement of Facts" is a recitation of facts unsupported by any citation to the record. However, in the attorney affidavit authenticating various exhibits, counsel for defendants has listed a series of facts with appropriate record citations, which cures any defect in the defendants' Rule 56.1 statement. The Court further notes that plaintiff, though represented by counsel, has failed to file and serve a response to those facts, in violation of Local Civil Rule 56.1. Generally, a "plaintiff['s] failure to respond or contest the facts set forth by the defendants in their Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed." *Jessamy v. City of New Rochelle*, 292 F. Supp. 2d 498, 504 (S.D.N.Y. 2003) (quoting *NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.*, 262 F. Supp. 2d 134, 139 (S.D.N.Y. 2003)). However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted); *see also Gilani v. GNOC Corp.*, No. 04 Civ. 2935 (ILG), 2006 U.S. Dist. LEXIS 23397, at *4-*5 (E.D.N.Y. Apr. 26, 2006) (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56.1). Accordingly, in the exercise of its broad discretion, the Court will overlook this defect and will deem admitted only those facts in defendants' Rule 56.1 statement that are supported by admissible evidence and not controverted by other admissible evidence in the record. *See Jessamy*, 292 F. Supp. 2d at 504. Thus, in the instant case, although plaintiff only submitted an eight-page affidavit in opposition to defendants' motion, the Court has carefully reviewed all of the submissions to determine if plaintiff has any evidence to support his claims.

I said, [']I wouldn't know. You would know better than me. You're the one watching my home. You tell me.[']" (Plaintiff's 50-h Hearing at 333, Halpern Aff., Ex. J.) Plaintiff further represented that "piece by piece, my home was being searched and property seized, stolen out of my home." (Plaintiff's Deposition at 625, Halpern Aff., Ex. N.) He also told the responding officers that his phone was being tapped and the perpetrators "could have been either the FBI's office or it could have been the police department. Obviously, it was a Government Agency because I wasn't getting any response from the phone company." (Plaintiff's Deposition at 638, Halpern Aff., Ex. N.) Plaintiff informed the officers that he had set up four video cameras in his home "[t]o catch the person entering my home and stealing my property" but was unable to do so because "I felt the VCR tapes were being erased." (Plaintiff's Deposition at 647, Halpern Aff., Ex. N.)

Officer Riolo, one of the responding officers, proceeded to inspect the area of the alleged break-in, at which time plaintiff told him that members of the police department were the perpetrators of the burglary and had used a "magic key" to enter his home. (Riolo Deposition at 14, Halpern Aff., Ex. Q.) Officer Riolo then made the determination that plaintiff should be transported to NUMC for a psychiatric evaluation and called for back-up to assist in the process. (Riolo Deposition at 15, Halpern Aff., Ex. Q.) He arrived at this conclusion based on his belief that: 1) plaintiff was delusional in believing that "the police and the FBI were breaking into his house and taking things and erasing his video tape"; and 2) "after seeing a rifle in the closet of the small bedroom . . . [plaintiff] was a danger if not [to] himself, to maybe the next police officer that comes knocking at his house." (*Id*.)

Plaintiff was then transported to NUMC via ambulance and interviewed and evaluated in the psychiatric emergency room. Prior to the transfer, plaintiff admitted to Officer Riolo that he had, on more than one occasion, filmed children in his neighborhood who crossed over his property line, a fact Officer Riolo relayed to the examining psychiatrist, Dr. Qazi. (Halpern Aff. ¶¶ 31-32, Exs. N, Q.)

Plaintiff stated the following to Dr. Qazi during the interview: 1) policemen had been stealing items from his home, including underwear and pornographic videotapes; 2) he reported this allegation to the FBI and "Washington DC"; 3) the police were watching him; and 4) the police were after him. (Qazi Aff. ¶ 4, Halpern Aff., Ex. R.) Following the examination, Dr. Qazi arrived at the medical opinion, based on her interviews with plaintiff and Officer Riolo, as well as the available medical records, that plaintiff was extremely paranoid and suffered from delusional disorder. (Qazi Aff. ¶ 5, Halpern Aff., Ex. R.) She further determined that, in her medical opinion, plaintiff was a danger to himself or others. (Qazi Aff. ¶ 6, Halpern Aff., Ex. R.)

Dr. DeLarosa, the attending physician in the emergency room that day, conducted a separate interview with plaintiff, wherein plaintiff reported that he had contacted the FBI and "Washington DC" about the alleged police break-ins and that he believed his phones were being tapped. (Halpern Aff. ¶ 35, Exs. K, N.) Dr. DeLarosa also determined that plaintiff was paranoid and delusional, and a danger either to himself or to others. (DeLarosa Deposition at 16, Halpern Aff., Ex. P.) Specifically, she stated that:

3

> [T]he intent of the paranoia is the one that really, you know, put a red flag in my head. He has been paranoid for years. All right? But the only acting out behavior he did was just writing and that to me is benign, but when the object of your paranoia is the police and you call the police, it means that, you know, it's getting to the point that it's bothering him so much that, you know, his functioning is impaired and I want to make sure that he's okay. That's why I admitted him.

(DeLarosa Deposition at 18, Halpern Aff., Ex. P.) Dr. Qazi and Dr. DeLarosa discussed the case and agreed that plaintiff should be involuntarily admitted to the hospital. (Qazi Aff. ¶ 6, Halpern Aff., Ex. R.) Dr. Qazi then signed the Office of Mental Health Forms 475 and 475SR, based upon her examination and medical opinion, and provided plaintiff with a copy of the Office of Mental Health Form 475SR, entitled "Notice of Status and Rights Involuntary Admission on Certificate of a Director of Community Services or Designee." (*Id*.) Plaintiff confirms that he was informed that he could make a written request for a court hearing to challenge his confinement and that he had the right to speak with an attorney. (Plaintiff's 50-h Hearing at 516, Halpern Aff., Ex. K.) He further acknowledges that a notice was posted in the hospital hallway detailing his rights as a committed patient (*id*.), and that a phone was made available to him, but he opted not to use it. (Plaintiff's Deposition at 661, Halpern Aff., Ex. N.)

On September 14, 2005, plaintiff was examined by a third physician, Dr. Robert Barris, who confirmed that plaintiff was a danger to himself. (Barris Deposition at 108, Halpern Aff., Ex. O.) Plaintiff remained in the psychiatric ward at NUMC for sixteen days, at which time he was released. (Plaintiff's Opposition ¶ 21.) Plaintiff alleges that "on the day before [he] was allowed to leave, Dr. Barris told [him] that [he] would not be discharged from the psychiatric ward until [he] promised to never call the police again and that if [he] called the police again [he] would spend the rest of [his] life in a state mental institution." (*Id*. ¶ 22.) Plaintiff maintains that "[a]t no time during [his] contact with the police on September 13, 2005, or in the sixteen days afterward in the psychiatric ward was [he] violent toward [him]self or others," nor did he "threaten violence toward [him]self or others." (*Id*. ¶¶ 26-27.)

Defendants also offer, as expert testimony, the opinion of Dr. Robert Cancro, a Board Certified Psychiatrist. Dr. Cancro opines, based upon his review of the relevant transcripts and medical records, that the medical treatment afforded to plaintiff was appropriate under the circumstances and conformed with the accepted standard of medical/psychiatric care. (Cancro Aff. ¶ 5, Halpern Aff., Ex. S.) Specifically, Dr. Cancro notes that, based on his review of the aforementioned materials, it is his medical opinion that:

> [Plaintiff] did not have any insight into his delusions and began acting on them when he called 911 on 9/13/05. The fact that he acted out on the delusion is a sign that he was becoming more frustrated and

more angry which is an indication that he is acting out impulsively. [Plaintiff] remained convinced that the delusions were real and could not be swayed from his fixed illogical ideas. This is a sign of psychiatric illness, delusional paranoia which required medical intervention to prevent [plaintiff] from harming himself or others.

(Cancro Aff. ¶ 7, Halpern Aff., Ex. S.)

In opposition, plaintiff has provided the unsworn affirmation of licensed psychologist Gregory T. Anderson,[4] who states, after a review of plaintiff's hospital record, that "none of the acts used to admit [plaintiff] actually happened on [September 13, 2005]" and plaintiff "was not a danger to himself or anybody else and should not have been admitted involuntarily." (Anderson Aff. ¶ 10.)[5] Mr. Anderson is not a psychiatrist, nor a medical doctor, and plaintiff has not provided the Court with his curriculum vitae or any other documentation attesting to Mr. Anderson's qualifications to opine on the subject of generally accepted medical standards. Further analysis regarding the admissibility of Mr. Anderson's statements follows in the discussion section.

B. Procedural History

On September 12, 2006, plaintiff filed the instant action against all parties. On March 15, 2007, plaintiff filed an amended complaint, dropping the County of Nassau as a defendant. Defendant DeLarosa filed an answer on May 14, 2007. Officer Riolo and the Nassau County Police Department filed their answer on May 15, 2007. Defendants Qazi and NHCC filed their answer on May 17, 2007. On January 31, 2008, the Court "so ordered" a stipulation dismissing defendants DeLarosa and Qazi in their individual capacities. On February 5, 2008, the Court "so ordered" a stipulation dismissing Officer Riolo and the Nassau County Police Department. The remaining defendants filed their motion for summary judgment on March 2, 2009. Plaintiff filed his opposition on April 16, 2009. Defendants submitted their reply on

---

[4] In addition to being unsworn, it is also unclear to the Court whether Mr. Anderson actually even signed the document. The statement has no signature line, but rather has the words "Perfect" and "Gregory T. Anderson, Ph.D" handwritten after the typed text, accompanying the handwritten date of "4/13/2009." (*See* Anderson Aff.)

[5] The Court notes that the majority of Mr. Anderson's affirmation is littered with conclusory speculation regarding "agreements" between unspecified hospital personnel and law enforcement agents to involuntarily commit "homeless or foreign nationals . . . to keep them off the streets." (Anderson Aff. ¶ 3.) Mr. Anderson's conclusory assertions appear to be grounded in his experience working as an unlicensed psychologist at Kings Park Psychiatric Center in the late 1970s, (*id*. ¶ 1), and are not only unsupported by any specific factual allegations, but are wholly irrelevant to the case at bar for, as defendants correctly note, "[t]he instant matter occurred some 32 years later in 2005, did not involve the Suffolk County Police, did not involve Kings Park Psychiatric Center, did not involve homeless [individuals] and did not involve foreign nationals." (Defendants' Reply, at 4.) Therefore, even if Mr. Anderson was competent to testify as an expert in the instant matter (which the Court has concluded he is not, for reasons stated *infra*), his wholly irrelevant conjecture regarding the pattern and practice of involuntary commitment procedures would fail to raise any triable issues of fact related to plaintiff's specific situation.

May 14, 2009. Oral argument was heard on May 29, 2009. This matter is fully submitted.

## II. STANDARD OF REVIEW

The standards for summary judgment are well-settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (holding that summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted); *Tufariello v. Long Island R.R.*, 364 F. Supp. 2d 252, 256 (E.D.N.Y. 2005). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecommc'ns, Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

## III. DISCUSSION

Defendants argue that summary judgment is warranted dismissing the entirety of plaintiff's claims because the undisputed facts demonstrate that defendants fully complied with the requirements of the New York Mental Hygiene Law and, therefore, their actions did not run afoul of federal or state law. For the reasons set forth below, the Court agrees and grants defendants' motion as to the federal claim under Section 1983. Specifically, the Court finds that no reasonable finder of fact could conclude that defendants unlawfully deprived plaintiff of his federal constitutional rights and, thus, summary judgment on the federal claim is warranted. Further, because the Court grants defendants' motion for summary judgment on

6

plaintiff's federal claim, it declines to exercise jurisdiction over his pendent state claims and they are hereby dismissed, without prejudice.

## A. Section 1983

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and laws; (2) by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). Plaintiff has alleged that defendants violated his constitutional rights by involuntarily committing him to the psychiatric ward of NUMC. However, before proceeding to examine the alleged violation of constitutional rights, the Court must first determine, as a threshold matter, whether the defendants were acting under the color of state law.

### 1. Color of State Law

An individual acts under color of state law when he or she exercises power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Polk County v. Dodson*, 454 U.S. 312, 317-18 (1981) (quoting *United States v. Classic*, 313 U.S. 299 (1941)). Thus, a deprivation of a federal statutory or Constitutional right is actionable under Section 1983 when such deprivation is caused "by the exercise of some right or privilege created by the State . . . or by a person for whom the State is responsible." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). Under this standard, "generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *West v. Atkins*, 487 U.S. 42, 50 (1988); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982) (an individual is a state actor "because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State").[6]

In the instant case, NHCC is organized as a public benefit corporation under the laws of the State of New York. *See* N.Y. Pub. Auth. Law §§ 3400-3420 (McKinney 1997). As such, NHCC and its employees qualify as state actors for purposes of a Section 1983 claim. *See* N.Y. Pub. Auth. Law § 1261(13) (McKinney 1982) (stating that "'State Agency' shall mean any . . . public benefit corporation . . . of the state"); *Pisani v. Westchester County Health Care Corp.*, 424 F. Supp. 2d 710, 717 (S.D.N.Y. 2006) (hospital's status as public benefit corporation rendered it liable under Section 1983 as a state actor); *Majer v. Metro. Transit Auth.*, No. 90 Civ. 4608 (LLS), 1990 WL 212928, at *3 (S.D.N.Y. Dec. 14, 1990) (stating that "[t]he MTA is a public benefit corporation under the New York Public Authorities Law §§ 1260-1278 (McKinney 1982), and as such its action is deemed state action."); *see also Philippeaux v. N. Cent. Bronx Hosp.*, 871 F. Supp. 640, 652 (S.D.N.Y. 1994) (employees of public benefit corporation hospital were state actors for purposes of Section 1983

---

[6] Conduct which satisfies the "state action" requirement of a Fourteenth Amendment claim also meets the "under color of state law" requirement of a Section 1983 claim. *See, e.g., Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 n.2 (2001).

claim). Therefore, plaintiff has met the first prong of his Section 1983 claim.

2. Deprivation of a Constitutional Right

In the instant matter, plaintiff alleges that defendants violated his rights when they confined him against his will for the administration of psychiatric treatment. This type of "[i]nvoluntary civil commitment raises two potential constitutional issues: a person's Fourth Amendment right against unreasonable search and seizure, and the right to due process under the Fourteenth Amendment." *Drozdik v. City of N.Y.*, No. 01 Civ. 3300 (RCC) (GWG), 2003 WL 366639, at *4 (S.D.N.Y. Feb. 20, 2003) (citing *Glass v. Mayas*, 984 F.2d 55, 58 (2d Cir. 1993) and *Rodriguez v. City of N.Y.*, 72 F.3d 1051, 1061 (2d Cir. 1995)). The Court examines each claim in turn.[7]

---

[7] Plaintiff also asserts that his commitment violated rights secured by the First Amendment. Specifically, he appears to allege that the Nassau County Police Department took him to NUMC in retaliation for prior complaints he had made regarding police behavior and hospital personnel detained him there for the same retaliatory purpose. (*See, e.g.,* Plaintiff's Opposition ¶ 7 ("I was . . . detained and transported to the Nassau County Medical Center and held for 16 days. Against my will When he removed me from my home for exercising my Liberty right to complain under the first amendment.").) Though the Second Circuit has found that involuntary commitment can potentially raise cognizable claims under the First Amendment, *see Winters v. Miller*, 446 F.2d 65, 70 (2d Cir. 1971), plaintiff has failed to provide any factual support for such a claim here. First, any claims arising from allegations that the *police officers* violated plaintiff's First Amendment rights were terminated when those parties were dismissed as defendants from this action. Second, even if those individuals remained parties to this action, plaintiff has failed to raise any issues of triable fact on this claim against the non-party police officers or the remaining defendants. It is well-settled in the Second Circuit that "[t]o prevail on [a] free speech claim, plaintiff must prove: (1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right." *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001). Even assuming *arguendo* that plaintiff meets the first and third requirements, he fails to put forth evidence sufficient to raise a genuine issue of material fact on improper motive. *See Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2003) (holding that a First Amendment retaliation claim cannot be based on "conclusory assertions of retaliatory motive"; rather, "[plaintiff] must produce 'some tangible proof to demonstrate that [his] version of what occurred was not imaginary'") (quoting *Morris v. Lindau*, 196 F.3d 102, 111 (2d Cir. 1999) (latter alteration in original)); *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998) (holding that a party opposing summary judgment "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful"). Furthermore, even if plaintiff had provided more proof beyond his conclusory allegation, he still would be unable to establish that defendants acted on an improper motive, for in the context of seizures by state actors, "if the [arresting] officer . . . had probable cause . . . then [the court] will not examine the officer's underlying motive in arresting . . . the plaintiff." *Singer v. Fulton County Sheriff*, 63 F.3d 110, 120 (2d Cir. 1995). In the context of involuntary civil commitment, hospital personnel have "probable cause" to confine an individual if "'there are reasonable grounds for believing that the person seized is dangerous to herself or to others.'" *Anthony v. City of N.Y.*, 339 F.3d 129, 137 (2d Cir. 2003) (quoting *Glass v. Mayas*, 984 F.2d 55, 58 (2d Cir 1993)). As set forth *infra*, the Court finds that the undisputed facts demonstrate

### a. Fourteenth Amendment

It is well-settled that "[a]n involuntary civil commitment is a 'massive curtailment of liberty,' . . . and it therefore cannot permissibly be accomplished without due process of law." *Rodriguez v. City of N.Y.*, 72 F.3d 1051, 1061 (2d Cir. 1995) (quoting *Vitek v. Jones*, 445 U.S. 480, 491 (1980) (internal citations omitted)); *see Graves v. MidHudson*, No. 04 Civ. 3957 (FB), 2006 WL 3103293, at *3 (E.D.N.Y. Nov. 2, 2006). While "New York's overall statutory scheme governing involuntary commitments has been held facially sufficient to meet the requirements of due process[,]" *Rodriguez*, 72 F.3d at 1062, "erroneous commitments, of course, implicate the individual's interest in liberty." *Goetz v. Crosson*, 967 F.2d 29, 33 (2d Cir. 1992); *see also Fisk v. Letterman*, 501 F. Supp. 2d 505, 525 (S.D.N.Y. 2007) (noting that "the Second Circuit has held that New York's Mental Hygiene Law meets the requirements of procedural due process.") (internal citation omitted). Therefore, if defendants' actions comported with the strictures of the New York Mental Hygiene Law, they also satisfied the requirements of procedural due process. Accordingly, the Court must determine whether the undisputed facts demonstrate that defendants complied with the procedures of that law. As set forth *infra*, the Court concludes that they did.

### i. Legal Standard

New York's Mental Hygiene Law provides for the involuntary civil commitment of a person "alleged to have a mental illness for which immediate observation, care, and treatment in the hospital is appropriate" upon the determination that the illness "is likely to result in serious harm" to that person and/or others. N.Y. Mental Hygiene Law § 9.39. A mental illness is "likely to result in substantial harm" when it poses "substantial risk of physical harm to [the individual] as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself, or a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear or serious physical harm." *Id.* § 9.39(a)(1-2). Accordingly, though no overt act is expressly required, there must be *some* showing of danger in order to invoke the procedures of Section 9.39. *See Rodriguez*, 72 F.3d at 1062-63 ("'Assuming that . . . the mentally ill can be identified with reasonable accuracy, there is still no constitutional basis for confining such persons involuntarily if they are dangerous to no one and can live safely in freedom.'") (quoting *O'Connor v. Donaldson*, 422 U.S. 563, 575 (1975)). A showing that meets the strictures of Section 9.39 is guided by the medical principles that are generally accepted in the community. *See Rodriguez*, 72 F.3d at 1062-63; *see also Ruhlman v. Ulster County Dep't of Soc. Servs.*, 234 F. Supp. 2d 140, 171 (N.D.N.Y. 2002) (stating that "findings [under Section 9.39] must be made in accordance with the generally accepted medical standards of the community"). To that end, the Second Circuit has stated that:

> Implicit in § 9.39's requirement that the decision be made by a physician is the premise that the decision will be made in accordance with the standards of the medical

---

that Drs. Qazi and DeLarosa had probable cause to detain plaintiff and, therefore, were not improperly motivated to do so by plaintiff's exercise of his right to free speech.

9

profession. Though committing physicians are not expected to be omniscient, the statute implicitly requires that their judgment – affecting whether an individual is to be summarily deprived of her liberty – be exercised on the basis of substantive and procedural criteria that are not substantially below the standards generally accepted in the medical community. Due process requires no less.

*Rodriguez*, 72 F.3d at 1063. "In order to demonstrate an objective violation of those standards, therefore, a plaintiff ordinarily must introduce expert testimony to establish the relevant medical standards that were allegedly violated." *Olivier v. Robert L. Yeager Mental Health Ctr.*, 398 F.3d 183, 190 (2d Cir. 2005) (vacating jury verdict entered in favor of subject of involuntary confinement where he failed to present expert testimony regarding medical standards). If there is a disagreement between the parties' respective expert witnesses over what comprises "standards generally accepted in the medical community," the resolution of that issue is left to the finder of fact. *Id.*; *see Ruhlman*, 234 F. Supp. 2d at 171 (factual dispute between parties' experts regarding community medical standards precluded summary judgment).

Finally, in addition to the substantive requirements described *infra*, the Mental Hygiene Law also has mandatory notice provisions, which require that hospital personnel provide an involuntarily admitted individual with "written notice of his status and rights as a patient under this section." N.Y. Mental Hygiene Law § 9.39. Section 9.07 further compels hospitals to "post copies of a notice, . . . at places throughout the hospital where such notice will be conspicuous and visible to all patients, stating the following: 1) the availability of the mental hygiene legal service; 2) a general statement of the rights of patients under the various admission or retention provisions of this article; and 3) the right of the patient to communicate with the director, the board of visitors, the commissioner of mental health, and the mental hygiene legal service."

ii. Application

In the instant case, it is undisputed that plaintiff informed the two examining physicians in separate interviews that: 1) police officers had been breaking into his home and stealing items such as underwear and pornographic tapes; 2) he had reported these burglaries to federal law enforcement agencies; 3) police officers were "watching" him and wiretapping his telephone; and 4) he had, on more than one occasion, videotaped neighborhood children when they crossed his property line. Both physicians concluded, in their medical opinions, that plaintiff posed a danger either to himself or to others and, therefore, involuntary commitment was warranted. Specifically, Dr. DeLarosa noted that she felt involuntary admission was appropriate and plaintiff posed a potential danger to himself and/or others because he had not only suffered paranoid delusions, but had acted upon them when he called the police department to his home.[8] The medical

---

[8] Plaintiff argues, in his opposition, that "[a]t no time during [his] contact with the police on September 13, 2005, or in the sixteen days afterward in the psychiatric ward was [he] violent toward [him]self or others," nor did he "threaten violence toward [him]self or others." (Plaintiff's Opposition ¶¶ 26-27.) However, the law is clear that no "overt act" of danger, such as violent behavior or a direct threat, is "expressly required"

records document the aforementioned medical opinions of both examining physicians. It is further undisputed that the doctors complied with the procedural requirements of N.Y. Mental Hygiene Law § 9.37 by 1) confirming with another physician that immediate commitment was warranted prior to admission; 2) providing plaintiff with written notice of his status and rights via the Office of Mental Health Form 475SR, entitled "Notice of Status and Rights Involuntary Admission on Certificate of a Director of Community Services or Designee"; and 3) informing plaintiff of his right to challenge his confinement and retain legal counsel to assist in that process.[9]

Defendants' expert witness, Dr. Cancro, confirms, in his sworn affidavit, that the defendant physicians acted in accordance with the generally accepted standards of the medical community, testifying that it was his opinion "within a reasonable degree of medical certainty that the care and treatment rendered to [plaintiff] at Nassau University Medical during his admission in September 2005 was at all times appropriate, medically indicated and in complete conformity with the accepted standard of medical/psychiatric care." (Cancro Aff. ¶ 5, Halpern Aff., Ex. S.) Although plaintiff has submitted the unsworn statement of psychologist Gregory T. Anderson, presumably to dispute this representation, defendants argue that Mr. Anderson's opinion is inadmissible as expert testimony under *Daubert v. Merrell Down Pharm., Inc.*, 509 U.S. 579 (1993). For the reasons set forth below, the Court agrees.[10]

---

in order for the involuntary commitment procedures outlined by the Mental Hygiene Law to meet the strictures of federal due process. *See Rodriguez*, 72 F.3d at 1062-63. Indeed, the patient need only make "some showing of danger." *Id*. In the instant case, Dr. DeLarosa concluded that plaintiff made such a showing by acting upon his paranoid delusions in calling the police to his home, and Dr. Cancro concurred with that opinion, based on his review of the record. Accordingly, the fact that plaintiff did not actually harm himself or others, or threaten such violence, does not raise an issue of triable fact as to whether defendants properly invoked the procedures of Section 9.39.

[9] Although plaintiff asserts, in a wholly conclusory manner, that defendants "failed to apply the statutory criteria of the provisions of New York Mental Hygiene Law," (Plaintiff's Opposition ¶ 12), he provides the Court with no factual allegations to support that argument and, indeed, failed to dispute the specific factual evidence of compliance presented by defendants in support of the instant motion. Accordingly, his conclusory denial that defendants did not follow the procedural requirements of the Mental Hygiene Law does not raise a genuine issue of material fact on that issue. *See, e.g., Butler v. Potter*, No. 06 Civ. 3828 (JFB) (WDW), 2009 WL 804722, at *12 (E.D.N.Y. Mar. 26, 2009) ("[P]laintiff offers nothing more than conclusory allegations in his complaint and in his deposition, with no basis in fact . . . and, thus, there is no evidence from which to create a genuine issue of material fact for trial."); *Winkfield v. City of N.Y.*, No. 97-CV-2183 (HB), 1999 U.S. Dist. LEXIS 19193, at *14 (S.D.N.Y. Dec. 14, 1999) ("[P]laintiff has failed to come forward with any evidence whatsoever and relies on conclusory allegations and his own belief alone. That's just not enough.") (citing *Holt v. KMI-Cont'l*, 95 F.3d 123, 130 (2d Cir. 1996)).

[10] Although a Rule 104(a) pretrial evidentiary hearing is often necessary to address *Daubert* issues, such hearings are unnecessary if the objections to the testimony being raised do not turn on factual issues and, thus, can be decided based on the written submissions and evidence. *See generally* MICHAEL H. GRAHAM, 2 HANDBOOK OF FED. EVIDENCE § 702.5 (5th ed. 2002) ("In light of the Supreme Court's emphasis of broad discretion granted to trial courts in assessing the relevance and reliability of expert testimony, and in the absence of any authority mandating such a hearing, we conclude that trial courts are not

As a threshold matter, the Court notes that in deciding whether a motion for summary judgment should be granted, it may only consider admissible evidence. *Accord Nora Bevs., Inc., v. Perrier Group of Am., Inc.*, 164 F.3d 736, 746 (2d Cir.1998) (stating that on summary judgment motion, "[a] district court properly considers only evidence that would be admissible at trial"); *Tamarin v. Adam Caterers*, 13 F.3d 51, 53 (2d Cir. 1993). Thus, as the Second Circuit has explained, it is the proper role of the district court to consider the admissibility of expert testimony in determining whether summary judgment is warranted:

> Because the purpose of summary judgment is to weed out cases in which "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law," Fed. R. Civ. P. 56(c), it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment. Although disputes as to the validity of the underlying data go to the weight of the evidence, and are for the fact-finder to resolve, questions of admissibility are properly resolved by the court. The resolution of evidentiary questions on summary judgment conserves the resources of the parties, the court, and the jury.

*Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) (internal citations and footnotes omitted). In other words, "[t]he court performs the same role at the summary judgment phase as at trial; an expert's report is not a talisman against summary judgment." *Id.* at 66. Thus, if the expert testimony is excluded as inadmissible under the Rule 702 framework articulated in *Daubert* and its progeny, the summary judgment determination is made by the district court on a record that does not contain that evidence. *Id.* at 66-67. Such an analysis must be conducted even if precluding the expert testimony would be outcome determinative. *See G.E. v. Joiner*, 522 U.S. 136, 142-43 (1997). Accordingly, the Court must examine the admissibility of plaintiff's expert testimony in ruling on defendants' motion for summary judgment.

---

compelled to conduct pretrial hearings in order to discharge the gatekeeping function."). Here, neither party requested such a hearing. Moreover, defendants' objections to the testimony of plaintiff's purported expert deal with his qualifications and raise legal arguments based on undisputed facts about such qualifications. Thus, these *Daubert* issues can be decided based on the written record. Accordingly, the Court finds that a hearing is unnecessary under the particular circumstances of this case. *See, e.g., Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 248-49 (6th Cir. 2001) (holding that district court was not required to hold *Daubert* hearing before excluding evidence); *Oddi v. Ford Motor Co.*, 234 F.3d 136, 154-55 (3d Cir. 2000) (rejecting argument that *Daubert* hearing was required where court had reviewed record which included two depositions, a declaration, and an expert report); *see also Colon v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 71 (S.D.N.Y. 2001) ("Nothing in *Daubert*, or any other Supreme Court or Second Circuit case, mandates that the district court hold a *Daubert* hearing before ruling on the admissibility of expert testimony, even where such ruling is dispositive of a summary judgment motion.").

The admissibility of expert testimony is analyzed under Rule 702 of the Federal Rules of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Thus, under Rule 702, the district court must make several determinations before allowing expert testimony: (1) whether the witness is qualified to be an expert; (2) whether the opinion is based upon reliable data and methodology; and (3) whether the expert's testimony on a particular issue will assist the trier of fact. *See Nimely v. City of N.Y.*, 414 F.3d 381, 396-97 (2d Cir. 2005).

Defendants attack the admissibility of Mr. Anderson's statements based on his purported lack of qualifications, and indeed, under the *Daubert* standard, the Court must first determine whether the expert has sufficient qualifications to testify before proceeding to the remaining factors. *See Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 360 (2d Cir. 2004) (stating that, where the witness lacked qualifications, an analysis of the remaining *Daubert* factors "seems almost superfluous"). Specifically, under Rule 702, the Court must determine whether the expert is qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. A court should look at the totality of the witness' qualifications in making this assessment. *See, e.g., Rosco, Inc. v. Mirror Lite Co.*, 506 F. Supp. 2d 137, 144-45 (E.D.N.Y. 2007) ("A court must consider the 'totality of a witness' [] background when evaluating the witness'[] qualifications to testify as an expert.") (quoting 29 WRIGHT & GOLD, FED. PRAC. & PROC. § 6265, at 246 (1997)); *accord Keenan v. Mine Safety Appliances Co.*, No. CV-03-0710 (TCP) (ARL), 2006 WL 2546551, at *2 (E.D.N.Y. Aug. 31, 2006). In addition, the Court must ensure that the expert will be proffering opinions on issues or subject matter that are within his or her area of expertise. *See Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 80 (2d Cir. 1997).

The proponent of the expert testimony bears the burden of establishing the admissibility of such testimony by a preponderance of the evidence standard. *See Daubert v. Merrell Down Pharm., Inc.*, 509 U.S. 579, 593 n.10 (1993) ("[M]atters [of admissibility] should be established by a preponderance of proof.") (citing *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987)); *see also* Fed. R. Evid. 702 advisory committee's note ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.").

As a threshold matter, Mr. Anderson's statement is unsworn, and plaintiff's counsel conceded at oral argument that it cannot be considered by the Court on that basis alone, and abandoned any attempt to have the Court

rely upon it. Moreover, it is undisputed that Mr. Anderson is not a psychiatrist, or even a medical doctor. Mr. Anderson states that he is a licensed psychologist, but has not submitted a curriculum vitae or any other form of documentary proof attesting to his qualifications to opine on the subject matter at hand. Indeed, the Court finds that, as a psychologist, Mr. Anderson would not be competent to testify regarding generally accepted standards of *medical* care as they relate to the involuntary admission of a patient to a psychiatric hospital. *See, e.g., Finnegan v. Univ. of Rochester Med. Ctr.*, 34 Fed. Appx. 26 (2d Cir. 2002) (summary order) (affirming district court's determination that a non-medical expert was not qualified to testify "as to the standard of care prevailing in the medical community"); *LaMarque v. N. Shore Univ. Hosp.*, 227 A.D.2d 594, 594-95 (N.Y. App. Div. 1996) (subject of involuntary admission could not raise issue of fact regarding whether treatment by defendants fell below accepted standards of medical care because "plaintiffs' expert [a licensed psychologist], who is not a medical doctor, failed to show her qualifications to render an expert opinion as to the appropriate standards of medical and psychiatric care, and what, if any, departures from that standard of care were committed by the defendants"); *McDonnell v. County of Nassau*, 129 Misc.2d 228, 232 (N.Y. Sup. Ct. 1985) (in rejecting the purported expert testimony of a licensed psychologist regarding alleged departure from accepted medical and/or psychiatric practice, stated that "where a medical discipline is in issue, a non-medical person cannot be permitted to offer testimony to a jury to establish what the proper medical and/or psychiatric standard of care was in this case and what, if any, departures from that standard of care were committed by the defendants.").

Furthermore, even assuming *arguendo* that Mr. Anderson's unsworn statement was admissible, and qualified as expert testimony, the assertions contained therein are conclusory at best, based upon factual inaccuracies,[11] and are therefore insufficient to create any triable issues of fact. *See Cerbelli v. City of N.Y.*, 600 F. Supp. 2d 405, 419 (E.D.N.Y. 2009) (expert's "wholly conclusory" and "inaccurate" statements failed to raise triable issue of fact); *see also Simmons v. United States*, 88 Fed. Appx. 435, 437-38 (2d Cir. 2004) (expert's conclusory statement that physician's actions fell below the standard of care was "rightly regarded by the district court as insufficient to raise a genuine issue of material fact"); *Kelsey v. City of N.Y.*, No. 03 CV 5978 (JFB) (KAM), 2007 WL 1352550, at *5 (E.D.N.Y. May 7, 2007) ("Conclusory affidavits, even from expert witnesses, do not provide a basis upon which to grant or deny motions for summary judgment.") (internal quotation and citation omitted).

Accordingly, the Court finds that plaintiff has failed to raise any genuine issues of material fact regarding defendants' comportment with the generally accepted standards of medical care and, by extension, their compliance with the requirements of the Mental Hygiene Law. Because satisfaction with the procedures of that law also meets the

---

[11] Specifically, while Mr. Anderson states that "none of the acts used to admit [plaintiff] actually happened on [September 13, 2005]," his assertion is directly contradicted by plaintiff's own admission, corroborated by the testimony and contemporaneous notes of the examining physicians, that plaintiff's 911 call to the police occurred on the date of his admission, September 13, 2005, a call which led his doctors to the conclusion that he was acting upon paranoid delusions and, therefore, presented a danger either to himself or others.

requirements of federal due process, defendant's Section 1983 claim brought pursuant to the Fourteenth Amendment must fail. *Accord Altamuro v. County of Nassau*, 33 Fed. Appx. 556, 561 (2d Cir. 2002) (summary order) (affirming district court's grant of defendant's motion for judgment as a matter of law where defendant presented proof that the aforementioned statutory requirements were met and care of plaintiff met generally accepted standards of medical community); *Mawhirt v. Ahmed*, 8 Fed. Appx. 125, 126-27 (2d Cir. 2001) (affirming district court grant of summary judgment dismissing federal constitutional claims arising from involuntary civil commitment despite plaintiff's dispute of medical and judicial conclusions that led to such commitment because "he raised no genuine issue of material fact as to whether he had been afforded procedural due process under the New York Mental Hygiene Law."); *Fisk v. Letterman*, 501 F. Supp. 2d 505, 524 (S.D.N.Y. 2007) (granting summary judgment on federal constitutional claim where plaintiff failed to raise triable issues of fact regarding whether process of involuntary commitment fell within generally accepted medical standards); *Dove v. City of N.Y.*, No. 03 Civ. 5052 (NG) (LB), 2005 WL 2387587, at *3 (E.D.N.Y. Sept. 28, 2005) (same); *Drozdik v. City of N.Y.*, No. 01 Civ. 3300 (RCC) (GWG), 2003 WL 366639, at *4 (S.D.N.Y. Feb. 20, 2003) (same); *Katzman v. Khan*, 67 F. Supp. 2d 103, 110 (E.D.N.Y. 1999) (same); *Sumay v. City of N.Y. Health and Hosp. Corp.*, No. 97 Civ. 3606 (SS), 1998 WL 205345, at *6 (S.D.N.Y. Apr. 28, 1998) (same); *Richardson v. Nassau County Med. Ctr.*, 840 F. Supp. 219, 222 (E.D.N.Y. 1994) (same). The Court next turns to plaintiff's claim under the Fourth Amendment.

b. Fourth Amendment

The Supreme Court has ruled that a "seizure," as prohibited by the Fourth Amendment, occurs only "when government actors have, 'by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen.'" *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). It is well-settled within the Second Circuit that involuntary civil commitment qualifies as such a seizure. *Glass v. Mayas*, 984 F.2d 55, 58 (2d Cir. 1993). However, "[a]n involuntary hospitalization does not violate the Fourth Amendment if it is based upon probable cause, meaning that there are reasonable grounds for believing that the person seized is dangerous to herself or to others." *Fisk v. Letterman*, 501 F. Supp. 2d 505, 526 (S.D.N.Y. 2007) (internal quotations and citations omitted). As set forth *supra*, the undisputed facts demonstrate that both examining physicians had reasonable grounds, within the parameters of generally accepted medical standards, for their determination that plaintiff posed a threat either to himself or others. Therefore, defendants had probable cause to seize plaintiff and his involuntary commitment did not violate the Fourth Amendment.

B. State Claims

Having granted summary judgment dismissing plaintiff's federal claim under Section 1983, the only remaining claims are those arising under state law, specifically, for false imprisonment, unlawful arrest, intentional infliction of emotional distress, and violation of the Mental Hygiene Law. Under 28 U.S.C. §1367(c)(3), the Court must consider whether it should continue to exercise jurisdiction over these remaining claims. In determining whether to continue to

retain jurisdiction, district courts consider factors such as judicial economy, convenience, fairness and comity. *See Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1191 (2d Cir. 1996). Although a court possesses the discretion to retain jurisdiction, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state law claims." *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)); *Baylis v. Marriott Corp.*, 843 F.2d 658, 665 (2d Cir. 1988) ("When all bases for federal jurisdiction have been eliminated from a case so that only pendent state claims remain, the federal court should ordinarily dismiss the state claims.") (quoting *Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)). Accordingly, because the Court has granted summary judgment on the federal claim, the Court exercises its discretion to decline jurisdiction over the remaining state law claims, and they are dismissed without prejudice.

IV. CONCLUSION

For the reasons set forth above, the Court grants defendants' motion for summary judgment as to the federal claim under Section 1983 and, thus, the Section 1983 claim is dismissed with prejudice. Because the Court declines to exercise supplemental jurisdiction over plaintiff's pendent state claims, they are dismissed without prejudice. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: June 16, 2009
Central Islip, NY

\* \* \*

The attorney for plaintiff is Irving Singer, Esq., 223 Fulton Avenue, Hempstead, New York 11550. The attorneys for defendants are Karen J. Halpern and Robert Farley, Esqs., Farley Glockner and Halpern LLP, 200 Old Country Road Suite 340, Mineola, New York 11501.